|  |  |
|---|---|
| FAMILY CIVIL LIBERTIES UNION, SURENDER MALHAN, for himself and as parent of E.M., and V.M., ELVIN SERRANO, for himself and as parent of L.S., ZIA SHAIKH for himself and as parent of M.S., S.S., and H.S., <br><br> **Plaintiffs,** <br><br> v. <br><br> STATE OF NEW JERSEY, et al, <br><br> **Defendants.** | Civ. No. 18-2597 (KM)(JBC) <br><br> **OPINION** |

### KEVIN MCNULTY, U.S.D.J.:

The plaintiffs, Surender Malhan, Elvin Serrano, Zia Shaikh, and the Family Civil Liberties Union, seek relief under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. The plaintiffs do not challenge particular rulings of the state family court. Rather, they assert that New Jersey's statutes, court rules, and case law do not provide sufficient constitutional protection of their custody rights in family court proceedings. Two of the plaintiffs have asserted the key claims here in prior actions, where they were denied in decisions upheld by the United States Court of Appeals for the Third Circuit.

Now before the Court are defendants' motions to dismiss the Third Amended Complaint ("Complaint").[1] For the reasons stated herein, those motions to dismiss are granted.

---

[1] Certain abbreviations will be used herein:

| | | |
|---|---|---|
| "DE __" | = | Docket Entry in this case |
| "Comp" | = | Third Amended Complaint (DE 45) |

# I.  Summary of Allegations

Plaintiffs' Complaint alleges the following facts. For purposes of this motion to dismiss only, I must assume the truth of the well-pleaded, factual[2] allegations, although of course they have not yet been tested by any fact finder at this procedural stage. *See* Section II, *infra*.

## a. Parties

The plaintiffs, Surender Malhan, Elvin Serrano, and Zia Shaikh, are New Jersey residents who have pending proceedings in New Jersey Superior Court, Family Division. (Comp ¶ 3). Each of these individual plaintiffs has lost custody in family court child-custody proceedings. (Comp ¶ 11).

Plaintiff Family Civil Liberties Union ("FCLU") is a § 501c(4) organization incorporated in New Jersey. (Comp ¶¶ 4, 5). FCLU has approximately 7,500 members across the United States. Nearly all of its 750 New Jersey members are or have been involved in New Jersey family court custody proceedings. (Comp ¶¶ 6, 7).

Defendant Gurbir Grewal is the Attorney General of New Jersey. He and ten fictitious "John Doe" defendants are named in their official capacities only, as persons "presumably. . . tasked with administ[ering] and enforcing New Jersey law." (Comp ¶¶ 14, 22).

Defendant Judge David Katz is the presiding judge of the family division of the Essex County Superior Court who has at times presided over Malhan's family court dispute. (Comp ¶¶ 15, 37). Defendant Judge Donald Kessler is a judge of the Essex County Superior Court who has at times presided over Malhan's family court dispute. (Comp ¶ 17). Judge Marcella Matos Wilson is a

---

[2]  I say "factual" advisedly. The Complaint is rife with legal conclusions and analysis. (*See, e.g.,* Comp ¶¶ 275, 354, 439–50, 473–79, 522). The Court is not bound to accept these legal conclusions and will not assume their truth for purposes of this motion. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007) (Noting that on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v. Allain,* 478 U.S. 265, 286, 106 S. Ct. 2932 (1986)).

judge of the family division of the Essex County Superior Court who has presided over Serrano's family court dispute. (Comp ¶ 18).

Defendant Richard Federici was hired by the State of New Jersey to perform counseling services for plaintiff Serrano's child. (Comp ¶ 19). Defendant Chester Sigafoos was hired by the State of New Jersey to do an evaluation of plaintiff Malhan and his family. (Comp ¶ 20).

Defendant Soaring Heights Charter School is a New Jersey charter school located in Hudson County which Malhan's children attended. (Comp ¶ 21).

### b. Allegations regarding Malhan case

### i. Malhan family court proceedings

Malhan's allegations grow out of a bitter divorce from Alina Myronova and a custody dispute over the couple's two children that began in 2011. (Comp ¶¶ 23–27). Over the course of those family court proceedings Malhan and Myronova made accusations against each other, including that Malhan was mentally unstable, that Myronova made several false representations, and that each had engaged in miscellaneous criminal conduct. (Comp ¶¶ 28–35). In early 2017, Hudson County prosecutors indicted Malhan based on accusations made by Myronova, but that indictment was later dismissed. (Comp at pp. 9–12).[3]

In 2017, Myronova filed a motion for an order to show cause in which she requested and received exclusive custody of their two children. (Comp ¶ 27). In making the custody determination, which was later relaxed, Judge Katz "appeared to" have relied upon information from the New Jersey Division of Child Protection and Permanency ("DCPP") that was provided to him *ex parte* and not entered into the record (hereinafter, the "DCPP Interim Report"). (Comp at pp. 14 –15) Plaintiffs take issue with the manner in which the DCPP communicated this information to the family court. (Comp ¶¶ 42–47).

---

[3]     Due to paragraph numbering errors in the Complaint, I will refer to the page number of the Complaint when necessary for clarity. The page number I use corresponds to the pages assigned through the Electronic Court Filing system.

According to the plaintiffs, the family court "appeared to entirely disregard all of the counter evidence presented by Malhan" and "appeared to be relying on the [DCPP Interim Report]" in making its custody determination. (Comp ¶¶ 44, 45).

Thereafter, in September 2017, Malhan filed his own motion for an order to show cause in an attempt to regain custody of his children. (Comp ¶¶ 47–53). In that motion Malhan complained that Myronova's boyfriend, Jeff Rothstein, was spending time alone with the children in violation of a prior family court order. (*Id.*). The family court has not taken any action to date in response to the allegation that Myronova violated its order. (Comp ¶ 58).

Malhan wanted the family court to hear evidence at an October 2017 hearing from a psychologist whom he had hired, Dr. Lidia Abrams, but the court denied that request. (Comp ¶¶ 54–62, 136–38, 149). During the October 2017 hearing, the family court also denied Malhan's renewed request to regain custody of his children. (Comp ¶¶ 63–67). Judge Katz based his decision to deny Malhan custody in part on the DCPP Interim Report, which articulated "child welfare concerns." (Comp ¶ 64). Judge Katz declined to disclose to the parties "what the children may or may not have said" to DCPP agents who created the Interim Report. (*Id.*). Malhan objects that this DCPP Interim Report amounts to "secret evidence" that was not admitted into the record, and therefore not subject to "meaningful opposition." (Comp ¶¶ 65–66).

Later in October 2017, the family court did permit the parties to review the DCPP Interim Report at the courthouse but did not permit them to keep a copy. (Comp ¶¶ 71–72). In describing the DCPP Interim Report, the family court noted that it was "relevant to. . . the emergent suspension of [Malhan's] visitation [privileges with his children]", and that it "raises some significant concerns about some interactions, and it quotes the children." (Comp ¶ 73).

Malhan's counsel took issue with the admissibility of the DCPP Interim Report. (Comp ¶ 76). Nonetheless, the family court determined that it would be "shunning [its] responsibilities if [it] turned a blind eye to" the DCPP Interim Report. (Comp ¶ 77). Therefore, the family court reasoned that until it received

"psychological evaluations that contradict or explain or create some type of factual issue [with regard to the DCPP Interim Report,] DCPP's recommendations and intimations need to be respected." (*Id.*). On this basis, the family court suspended Malhan's custody privileges and only allowed him limited, supervised visitations with the children. (Comp ¶¶ 77, 115).

At this point Malhan attempted to submit the psychological report of his retained psychologist, Dr. Abrams, which purportedly gave Malhan "a clean bill of health." (Comp ¶ 80). However, the family court would not consider Dr. Abrams's report until the DCPP finished its full assessment. From the Complaint, it can be inferred that the DCPP Interim Report, as the name implies, was an initial appraisal that would be followed by a more complete DCPP assessment. (Comp ¶ 81). The family court noted that without the full DCPP assessment, it was "not inclined to ignore the concerns raised by DCPP," which—although this is not directly stated in the Complaint—appear to be based on suspicions that Malhan may have had suicidal ideations. (*Id.*; Comp ¶ 120).

In November 2017, the DCPP completed its full assessment and submitted its findings to the family court. (Comp ¶ 102). As part of its assessment, the DCPP hired Dr. Sigafoos to conduct an evaluation of Malhan. This evaluation included an approximately hour-long interview in October 2017 and resulted in a report by Dr. Sigafoos (the "Sigafoos Report"). (Comp ¶¶ 107, 110). During a November 30, 2017 hearing, the family court announced that the previous intimations that Malhan was suicidal were unfounded. (Comp ¶¶ 116, 120). Nonetheless, said the court, the Sigafoos Report "raised some collateral concerns" about Malhan and his "parenting ability." (Comp ¶¶ 118, 120). The family court then allowed the parties to review the Sigafoos Report. (Comp ¶¶ 117–20). Malhan challenged the admissibility of that report on a variety of grounds. (*Id.*).

During this November 2017 family court hearing, Malhan again requested custody of his children. (Comp ¶ 121). The family court did not formally admit the Sigafoos Report into evidence but referred to it in deciding

not to grant complete custody to Malhan. (Comp ¶ 122). However, in an order dated November 30, 2017 (the "November 2017 Order"), Judge Katz did lift some of the prior restrictions on Malhan's custody rights and allowed him to have unsupervised daytime visits with the children on the weekends for the first two weeks (so as to transition the children back into increased parenting time with Malhan), to be followed by three overnight visits per week from Tuesday through Friday. (Comp ¶¶ 123–25).

Despite being granted limited custody rights in the November 2017 Order, Malhan generally takes issue with (a) the limitations imposed during the twelve-week period between the DCPP Interim Report and the November 2017 Order (whereby he was only permitted to see his children for a total of about ten hours in a supervised setting); and (b) the current, less onerous but still significant limitations on his custody. (Comp ¶¶ 115, 125–30). Malhan finds this twelve-week period and the custody limitations in general to be problematic because the DCPP assessments were not admitted into evidence, Malhan did not have complete access to some of those assessments, he did not get the chance to cross-examine the authors of those assessments, other witnesses presented information to the family court *ex parte*, and the family court allegedly did not make sufficient findings of fact with respect to its orders. (Comp ¶¶ 115, 127–30, 247–54).

In January 2018, the family court permitted Malhan's retained expert, Dr. Abrams, to review a portion of the Sigafoos Report. (Comp ¶ 132). According to the plaintiffs, Dr. Abrams thought the reviewed portion of the Sigafoos Report included "glaring deficiencies." (Comp ¶¶ 132–136). Meanwhile, Dr. Abrams's own evaluation concluded that Malhan did not pose a danger to the children and that the separation of the children from their father was contrary to the best interests of the children. (Comp ¶ 149).

Malhan asked the family court to hear from Dr. Abrams and other witnesses, but the court denied this request. (Comp ¶¶ 150–52). Malhan filed a motion with the New Jersey Appellate Division for leave to file an interlocutory appeal, but that motion was denied. (Comp ¶ 153). According to the plaintiffs,

there is no right to appeal the suspension or termination of custody in New Jersey because these types of family court orders are not final for appeal purposes. (Comp ¶ 154).

Despite the November 2017 Order granting Malhan limited custody rights, Myronova refused to comply and did not permit Malhan to see the children. (Comp ¶ 156). In December 2017, Malhan filed a motion for an order to show cause asking the family court to enforce its November 2017 Order. (Comp ¶ 159).

Judge Kessler—who had been out on medical leave during the period that Judge Katz presided—returned from leave and heard that motion on December 21, 2017. (Comp ¶ 205). Instead of enforcing the November 2017 Order, Judge Kessler again suspended all of Malhan's unsupervised parenting time and all overnight visits with the children. (Comp ¶ 206). Judge Kessler's determination was based in part on the Sigafoos Report. (Comp ¶¶ 206–07). Plaintiffs again took issue with the fact that the Sigafoos Report was not admitted into evidence, that "Judge Kessler appeared to accept and state the allegations as true," that Sigafoos had never testified or been subject to cross examination, and that the findings were contradicted by the opinion of Dr. Abrams. (Comp ¶¶ 208–09).

Judge Kessler also based his determination in part on information provided by the DCPP that one of the children had reported that Malhan was questioning the child about Myronova, in violation of one of Judge Kessler's prior orders. (Comp ¶¶ 210–11). Judge Kessler had not read the report by Dr. Abrams because it is "a party report" and he wanted to "get the independent evaluations" and "go from there." (Comp ¶ 215).

Malhan then participated in supervised visits with his children at a center called Peaceful Healing. (Comp ¶¶ 219–22). The owner of Peaceful Healing reported to the family court that Myronova and Rothstein "carelessly" made "derogatory" comments about Malhan in the presence of the children, insinuating that Malhan was a danger to be around. (*Id.*).

In January 2018, Malhan filed another motion for an order to show cause asking the family court to restore full custody, and to prevent Myronova from listening in on phone calls between Malhan and the children. (Comp ¶ 225). In February 2018, the family court did order that Myronova not listen in on the phone calls between Malhan and the children, but denied Malhan's request to vacate the custody restraints. (Comp ¶¶ 226–27). In denying this motion, the family court made repeated reference to the Sigafoos Report. (Comp ¶ 228). Malhan again objected to any consideration of the Sigafoos Report. (Comp ¶ 229).

On February 9, 2018, the family court restored Malhan's custody rights in accordance with the November 30 order, which had begun a transition process. In its order (the "February 9 Order"), the court ordered that Malhan's unsupervised parenting time would resume on February 10, 2018, and that his overnight unsupervised parenting time would resume on Wednesday, February 21, 2018 "at school let out."[4] (Comp ¶ 238). Malhan nonetheless contends that the de facto suspension of his parenting time between December 21, 2017 and February 21, 2018 violated due process. (Comp ¶ 239).

Despite the February 9 Order, Myronova refused to cooperate and did not relinquish custody on February 10. (Comp ¶¶ 241–42). Plaintiffs, without elaboration, contend that Myronova's noncooperation prompted the family court to again suspend all of Malhan's unsupervised parenting time. (Comp ¶¶ 243, 255). On February 15, 2018, the court ordered him to have supervised parenting time with the oversight of Maureen Grippo. (Id.). Since February 15, 2018, Malhan has had around two hours of supervised parenting time per week. (Comp ¶ 244).

On June 8, 2018, Judge Kessler recused himself from any further involvement in the Malhan/Myronova family court matter; he was replaced by Judge Katz. (Comp ¶¶ 258, 270). In July 24, 2018, Judge Katz ordered that

---

[4]     The inclusion of the phrase "at school let out" becomes relevant in light of the allegations against Soaring Heights. See Subsection I.b.ii, infra.

Malhan receive two days of unsupervised parenting time two days a week. (Comp ¶¶ 260, 263). Myronova refused to cooperate and Malhan began reporting to the police that Myronova had interfered with his custody, but the police took no action. (Comp ¶¶ 265, 267). When Malhan complained of this conduct to the family court, it did not sanction Myronova, and when Judge Katz learned of Malhan's reports to the police he "scowled and shook his head at Malhan." (Comp ¶ 268). Through September 2018, Malhan has only been permitted around one hour per week of supervised parenting time. (Comp ¶ 269).

As of the date of the filing of the Complaint, the current order of the family court provides that Malhan may not have any unsupervised visitation time with his children. (Comp ¶ 246). Throughout the Complaint, Malhan alleges that in making its determinations the family court selectively evaluated inadmissible evidence and ignored the evidence he tried to present. (Comp ¶¶ 68, 79, 82, 213).

Additionally, Malhan complains that he was not allowed to have counsel present when being evaluated by DCPP officials. (Comp ¶¶ 272–278). In September and October 2017, when Malhan met with DCPP officials for an evaluation of his potential suicidal ideations, DCPP told him that they would not speak to him in the presence of his legal counsel. (Id.). Malhan contends that if a person refuses to be evaluated by DCPP without counsel present, DCPP reports to the family court that the parent is not being cooperative. (Comp ¶ 274).

### ii. Malhan allegations regarding Soaring Heights

In 2017, Malhan's children attended Soaring Heights Charter School ("Soaring Heights"). Soaring Heights was given a copy of the November 2017 Order, which provided the following:

> 1. That the restraints on [Malhan's] parenting time have been lifted pursuant to the DPC&P report received by the Court on November 21, 2017 for the reasons stated on the record.
>
> 2. That [Malhan] shall have unsupervised day-time visits with the children on Saturdays and Sundays from 8:00AM until 7:00PM

beginning December 2, 2017 and continuing for two consecutive weekends, so as to transition the children back into parenting time with Defendant, for the reasons stated on the record.

    3. After the two weekends of unsupervised visitation conclude, [Malhan] is to have unsupervised parenting time with the children on Tuesdays after school until Friday mornings at school drop-off. The remaining days will be parenting time for [Myronova].

    4. Transfers of the children between [Malhan] and [Myronova] will continue to take place at the Bayonne Police Station.

(Comp ¶¶ 157, 165).

Despite this Order, Myronova refused to give Malhan the children on the two weekends starting December 2 and 9, 2017. (Comp ¶¶ 167–68). Nonetheless, Malhan sought to pick up his children after school on Tuesday, December 12, 2017. (Comp ¶¶ 170–71).

Malhan contacted Soaring Heights in advance to inform them of the November 2017 Order and let them know that he would be picking up the children from school on December 12 and that they would remain with him through December 14. (Comp ¶ 171). Soaring Heights's attorney responded by sending Malhan's attorney an email on December 11, in which the attorney communicated that the school would not permit Malhan to pick up the children due to a perceived ambiguity in the November 2017 Order:

> The Order requires that child-transfers between mom and dad occur at the Bayonne Police Station. The Order is silent on the manner in which student pick up and drop off should take place.
>
> Not having information on the circumstances over why the court has restricted child transfers in such manner, and having the utmost responsibility to maintain a safe school environment, the School will request clarification of the November 30, 2017 Order by letter tomorrow. In the meantime, the School will continue implementation of the status quo from last week, namely with mom picking up the children at School.

(Comp ¶ 172).

Despite this email, on Tuesday, December 12, 2017, Malhan arrived at Soaring Heights to pick up his children but the school refused to give the children to him. (Comp ¶ 181). The school similarly refused to allow Malhan to pick up the children on Wednesday and Thursday of that week. (Comp ¶ 182).

Malhan asserts that the school's refusal to give him his children was based on some unspecified, preexisting animus towards him. (Comp ¶¶ 187–89).

On December 13 Malhan's counsel contacted counsel for Soaring Heights for an explanation of the school's refusal. (Comp ¶ 183). The school's attorney provided the same reasons as in the December 11 email. (Comp ¶¶ 184–85). Malhan had no parenting time with his children during the week of December 12. (Comp ¶ 186).

On December 18, 2017, Malhan filed a complaint and motion for order to show cause in the Hudson County Superior Court seeking an order that would direct Soaring Heights to comply with the family court's November 30 Order. (Comp ¶ 192). Soaring Heights opposed Malhan's application. (Comp ¶ 193). The order to show cause was denied and the state court required Soaring Heights to provide a written response to the request for injunctive relief by January 10, 2018. (Comp ¶ 194). This motion for an order to show cause was mooted by the family court's decision to suspend all of Malhan's unsupervised parenting time, and the parties agreed to dismiss the Hudson County case without prejudice. (Comp ¶¶ 196, 204, 206).

### iii. Malhan allegations regarding Peaceful Healing

In December 2017, Malhan was limited to having supervised visitation with his children under the supervision of Peaceful Healing. (Comp ¶ 305). Malhan and the children had a supervised visit with Peaceful Healing scheduled for December 29, 2017. Malhan proposed that they all participate in a family karate class. (Comp ¶ 308). The head of Peaceful Healing agreed to this proposal and discussed the plan with Myronova. (Comp ¶ 309).

The Peaceful Healing supervisor at the time of the proposed December 29 karate excursion was Ms. Daru. (Comp ¶ 311). Although Ms. Daru prohibited recording, Malhan made an audio recording of a conversation involving the children and Ms. Daru. (Comp ¶¶ 310, 312–13). At that time, the children, "apparently acting at the direction of their mother," said they did not want to go to karate. (Comp ¶ 316). Malhan insisted that they go because "karate class was the plan that everyone had agreed to and he did not want to change it."

(Comp ¶ 317). Ms. Daru thought that if the children did not want to go to karate then they should change the plans. (Comp ¶ 318). Malhan reiterated that karate was the agreed upon plan and continued to drive to the family's residence to pick up the children's karate uniforms. (Comp ¶ 319).

When they arrived at the apartment Malhan went inside to get the uniforms and left the children in the lobby with Ms. Daru. (Comp ¶¶ 321–22). When Malhan returned to the lobby, Ms. Daru told Malhan that she was ending the visit. (Comp ¶ 323).

At some point in the following weeks, a letter was sent to the family court on Peaceful Healing stationery entitled "Parent Chaperone Summary." (Comp ¶ 324). The Summary was not court ordered and was not initially shared with the parties. (Comp ¶¶ 325–26). The Summary included a series of allegedly false accusations against Malhan, including that he had "angrily yelled" at the children multiple times, and that he talked "about how abuse is not bad because it sets discipline and order for the child." (Comp ¶ 327). Malhan asserts that the audio recording of the incident shows these accusations to be false. (Comp ¶ 328). This Summary made it more difficult for Malhan to have any parenting time with his children. (Comp ¶ 329). Malhan claims that the Summary was defamatory. (Comp ¶¶ 330–31).

### c. Allegations regarding Serrano case

#### i. Serrano allegations regarding family court proceedings and Dr. Federici

Plaintiff Serrano and his wife divorced in 2008. (Comp ¶ 282). They have one child, a daughter, who was fifteen at the time plaintiffs filed the Complaint. (Comp ¶ 283). Under the terms of their divorce, legal custody was joint and they shared parenting. (Comp ¶ 284). Between the divorce and September 7, 2017, Serrano's daughter lived with him around fifteen to twenty-two days per month. (Comp ¶ 285).

Citing concerns about abuse by his ex-wife, Serrano filed a motion to obtain full custody of his daughter around March 2017. (Comp ¶ 286). As a result of this request, the family court asked Dr. Richard Federici to counsel

Serrano's daughter. (*Id.*). Serrano also met with Federici several times between June and August 2017. (Comp ¶ 287). During a July 5, 2017 phone call, Dr. Federici told Serrano that Serrano was free to stop by his office to speak with Dr. Federici, who would try to give Serrano "a few minutes between patients" if he had time. (Comp ¶ 288).

Around August 28, 2017, Dr. Federici sent a letter to the family court offering advice on the Serrano custody dispute. (Comp ¶ 289). The next day, Serrano went to Dr. Federici's office around 12:30 P.M. to discuss the recommendations in Dr. Federici's letter. (Comp ¶ 290). Serrano recorded their interactions. (Comp ¶ 294). Initially, Dr. Federici told Serrano that it was not a good time to speak because Dr. Federici had a conference call. (Comp ¶ 291). Serrano intimated that he would depose or subpoena Dr. Federici in the family court matter. (Comp ¶ 347). Serrano then left the office and returned around 1:00 P.M. in the hopes that they could speak after Dr. Federici's conference call. (Comp ¶¶ 292, 346).

When Dr. Federici saw Serrano in the lobby area Dr. Federici was visibly upset to see him. (Comp ¶ 293). Dr. Federici said, "you're interfering with my practice, okay, go ahead, I'm going to give you a minute, please go." (Comp ¶ 351). Serrano then began discussing the August 28 letter that Dr. Federici sent to the family court. (*Id.*). The following exchange took place:

> ELVIN SERRANO: You say that you don't know the cause of stress for [child] and you recommending that [child] still resides with her mother and --
> DR. FEDERICI: -- I didn't say, it was [name] or it was you -- I didn't say who it was. I said, I'm not blaming a parent. What I'm going to do is I'm going to set this up so we take care of [child] and not blame parents, that's what I said. That's the point of that letter. It's not to determine blame. I will not do that. Don't put me in the corner. You're going to find out something about me, okay, are you threatening me right now?
> ELVIN SERRANO: I'm not --
> DR. FEDERICI: -- did you just threaten me?
> ELVIN SERRANO: What are you talking about --
> DR. FEDERICI: -- did you just threaten me, Elvin? I think you just threatened me --
> ELVIN SERRANO: -- I'm going to (indiscernible)--
> DR. FEDERICI: -- I think you just threatened me with your hand -- you

put your hand up like you were going to hit me --
ELVIN SERRANO: -- (indiscernible) --
DR. FEDERICI: -- you put your hand up like you were going to hit me.
Don't you dare put your hand up --
ELVIN SERRANO: -- I haven't --

(Comp ¶ 351). After this conversation Serrano left the office. (Comp ¶ 218).
Later that day Dr. Federici called the police to report that Serrano was
threatening him. (Comp ¶¶ 297, 302–03).

On August 30, 2017, Dr. Federici sent a letter to the family court
accusing Serrano of threatening him. (Comp ¶¶ 298–99). Dr. Federici's letter
asserted that Serrano was angry with him for the August 28 letter he had
written to the family court and claimed that Serrano "made a fist at me in a
menacing manner." (Comp ¶ 300). The following is an excerpt of Dr. Federici's
August 30 letter:

> [Serrano's] voice was calm, but he was physically acting
> aggressive/challenging, making faces at me, grimacing. The juxtaposition
> of a calm voice with an agitated facial expressions and demeanor, was
> bizarre and frightening. It became clear to me what was going on when
> he informed me that he was, and had always been secretly recording our
> conversations and videotaping me. He showed me the hidden camera,
> and then made a fist at me in a menacing manner. It was very tense and
> frightening. I started yelling, "you are threatening me", hoping to get Mr.
> Serrano to back down, and to get the attention of others in my building.

(Comp ¶ 301).

Dr. Federici's August 30 letter went on to describe how he called the
police after this incident and reported that he felt threatened by Serrano.
(Comp ¶ 303). According to that letter, the police recommended that Dr.
Federici remove himself from the case and also informed him that they told
Serrano over the phone that if he returned to Dr. Federici's office he would be
arrested. (Id.).

The family court "apparently relied" on these letters in restraining
Serrano from having any contact with Dr. Federici. (Comp ¶ 332). Plaintiffs
take issue with the family court's reliance on these letters because they include
"hearsay within hearsay." (Id.). Serrano's ex-wife also filed a motion for an
order to show cause that attached a copy of Dr. Federici's letter (the Complaint

is unclear as to whether it was the August 28 letter or the August 30 letter) and demanded an immediate change of custody. (Comp ¶ 336).

The family court held an emergent proceeding on September 7, 2017, in which Dr. Federici did not testify and was therefore not subject to cross examination. (Comp ¶¶ 337, 338, 343). Serrano testified under oath that he did not threaten Dr. Federici. (Comp ¶ 339). Serrano's ex-wife submitted a certification stating that, even though she was not present for the incident, Dr. Federici's assertions "rang true" to her. (Comp ¶ 340). The family court did not review the audio recording of the incident, but the plaintiffs assert that the audio recording shows that many of Dr. Federici's assertions in his August 30 letter were either false or misleading. (Comp ¶¶ 341, 345). The presiding family court judge, Judge Marcella Matos Wilson, stated that he knew Dr. Federici for many years and trusted him. (Comp ¶ 343). The family court made no findings of fact and ordered that Serrano's custody be limited on an interim basis. (Comp ¶¶ 352, 358).

In September 2017, the family court did not order any visitation for Serrano and his daughter, so Serrano made a request that the family court permit some visitation. (Comp ¶ 360). In November 2017, Serrano was permitted ten minutes with his daughter. (*Id.*). Starting in January 2018, Serrano began to have one hour supervised parenting time with his daughter each week at Peaceful Healing. (Comp ¶¶ 361, 381).

In a letter filed with this Court dated April 26, 2019, plaintiffs' counsel informed this Court that the family court issued an order dated February 13, 2019 that granted Serrano split 50/50 custody over his daughter and designates him as parent of primary residence. (DE 49).

### ii. Serrano allegations regarding Peaceful Healing

Peaceful Healing was appointed by the family court to help with Serrano's supervised visitations. (Comp ¶ 388). After the initiation of this lawsuit, Peaceful Healing informed Serrano that it did not wish to participate in his supervised visitations. (Comp ¶¶ 390–91).

Serrano asked Peaceful Healing to continue supervising the visits and pointed out that the initial iteration of the complaint did not involve allegations by him personally against Peaceful Healing; those allegations, he noted, involved only Malhan. (Comp ¶¶ 392–93). Serrano now alleges that Peaceful Healing abandoned him and retaliated against him due to this lawsuit. (Comp ¶ 395).

### d. Allegations regarding Shaikh case

In 2008 Shaikh filed for divorce from his wife, Laura Germandig-Shaikh ("Germandig"). (Comp ¶ 397). Shaikh and Germandig have three children together. (Comp ¶ 396). In April 2014, Germandig filed a motion in the family court requesting that Shaikh be excluded from the family residence and that she obtain full custody of the children. (Comp ¶ 399).

On April 23, 2014, counsel for Germandig appeared before the family court for a case management conference. (Comp ¶ 400). Shaikh had not been notified of the proceeding, and "for reasons which remain unclear, Shaikh's counsel did not attend." (Id.). The family court attempted to call Shaikh's counsel that morning but she could not be reached and the voice mailbox was full. (Comp ¶ 401).

At the April 23, 2014 proceeding Germandig's counsel made an oral application for an order to show cause to obtain exclusive custody of the children. (Comp ¶ 402). Germandig submitted an affidavit in which she accused Shaikh of "verbal harassment" and also claimed that Shaikh had "kicked" his daughter. (Id.). Germandig did not tell the family court that DCPP had investigated these allegations in 2014 and determined that they were unfounded. (Comp ¶ 403). The family court then asked Germandig various questions at the hearing, but she did not explain the basis for her accusation that Shaikh had kicked his daughter and did not claim to have witnessed the alleged incident—plaintiffs contend that this lack of personal knowledge makes these statements inadmissible. (Comp ¶ 405).

Also at the April 23, 2014 proceeding, Germandig's counsel claimed that Shaikh was a Pakistani national and there was a risk that he would take the

children out of the country. (Comp ¶ 406). Germandig's counsel told the family court that she was concerned about this risk even though Shaikh had never told anyone directly that he was planning to leave the country with the children. (Comp ¶¶ 407–08). Despite the fact that Shaikh is a naturalized U.S. citizen, the family court agreed with Germandig that there was a concern that Shaikh may try to take the children out of the country, which the family court determined would constitute immediate and irreparable harm. (Comp ¶¶ 409–10). The assessed flight risk was based on the following: Shaikh told the daughter that he was taking the children to Dubai on vacation; the daughter told Germandig about this trip; Shaikh then chastised the daughter for telling the mother about the trip and specifically told the children not to tell their mother when they have plans to leave the country. (Comp ¶ 410). Plaintiffs contend that the family court's concern of flight risk "appears to have been based" on speculation due to Shaikh's national origin and some "vague hearsay allegations." (Comp ¶ 411).

The family court granted the oral request at the April 23, 2014 proceeding for an order to show cause and awarded Germandig exclusive custody of the children. (Comp ¶ 414). This order barred Shaikh from returning to the residence, stripped him of legal and physical custody indefinitely until further order of the family court, made no provision for any parenting time, and did not explain the reasons for the decision. (*Id.*; Comp ¶ 415).

At a June 13, 2014 family court hearing, Shaikh appeared *pro se*, explained that he was not given notice of the April 23, 2014 proceeding, and denied all the allegations leveled against him. (Comp ¶ 417). Nonetheless, the family court ordered that Germandig continue to retain full legal and physical custody, and indefinitely suspended all of Shaikh's parenting time. (Comp ¶ 418). Consequently, Shaikh has rarely seen his children since then. (Comp ¶ 432).

In May 2015, Shaikh filed a motion with the family court requesting that his custody be restored. (Comp ¶ 421). In response, Germandig submitted an unsworn letter to the family court in June 2015 by a licensed clinical social

worker named Seth Arkuth, which recommended that any phone calls between Shaikh and the children be supervised by the mother, and in-person visitation be supervised by an experienced professional. (Comp ¶¶ 422–23). Shaikh objected to this letter as unsworn hearsay and noted that he had never met with Arkuth, but Germandig had met with him twelve times and the children seven times. (Comp ¶¶ 424–25).

Arkush's recommendation "appeared to be based on Germandig's claims of domestic violence," allegations that were discredited in June 2014. (Comp ¶ 426). Shaikh wrote his own letter objecting to the use of Arkush's letter and noted that Arkush was acting as a therapist for the children and was therefore prohibited under New Jersey law from offering an opinion about custody. (Comp ¶ 428). In January 2018, the New Jersey Board of Social Work Examiners fined and sanctioned Arkush for sending this letter because he improperly provided an opinion on parenting time when he was serving as a treating therapist. (Comp ¶ 429). Nonetheless, the family court "apparently relied on" Akrush's recommendation to deny Shaikh any custody or unsupervised visitation. (Comp ¶ 430).

In 2015, Shaikh brought a federal lawsuit as part of a larger group of parents that were denied full custody, which was ultimately dismissed. (Comp ¶¶ 434–35; *see* 3:14-cv-00760-FLW-DEA). Shaikh believes that his treatment in the family court became worse after he filed that federal suit. (*Id.*). For example, Shaikh has been repeatedly jailed for allegedly failing to pay child support, but the family court did not hold an "ability to pay" hearing. (Comp ¶ 436).

### e. Causes of Action

Plaintiffs assert that the defendants have a policy, practice, and custom of separating children from their parents without affording them an adequate hearing. (Comp ¶ 451).

In Count I, plaintiffs allege due process violations of the Fourteenth Amendment via 42 U.S.C. § 1983 based on denial or limitation of custody without a meaningful hearing. They seek a declaratory judgment pursuant to

28 U.S.C. §§ 2201 and 2202 that (1) the lack of a meaningful hearing violates due process and (2) disallowing parents from having counsel present at evaluative interviews violates due process. (Comp ¶¶ 473–489). Plaintiffs also seek parallel injunctive relief.

In Count II, plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that parents in custody disputes have a due process right to make audio or video recordings of interactions, including those with the children, social workers, and mental health professionals. (Comp ¶¶ 490–523).

In Count III, Malhan asserts a claim for defamation against Peaceful Healing and certain of its unnamed employees (named as John Doe defendants) for sending a report the family court relating their version of the karate class incident. He seeks damages. (Comp ¶ 524–551).

In Count IV, Serrano asserts a claim for defamation against Federici for sending the letter to the family court stating that Serrano had threatened him. He seeks damages. (Comp ¶¶ 552–557).

In Count V, Malhan asserts a retaliation claim against Judge Kessler, and Serrano asserts one against Peaceful Healing. Both are based on Malhan's or Serrano's having filed legal actions against them. They seek damages. (Comp ¶¶ 558–589).

In Count VI, Malhan asserts a "deprivation of rights under color of law" against Soaring Heights and certain of its employees (named as John Doe defendants) for not allowing Malhan to pick up his children from school on December 12, 2017. He seeks damages. (Comp ¶¶ 580–86). This is apparently a *Monell* claim pursuant to 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 660, 98 S. Ct. 2018, 2020 (1978). (*See* DE 43-1; DE 47; DE 48).

Defendants Attorney General Grewal, Judge Katz, Judge Kessler, Judge Wilson, and the DCPP (collectively, the "State Defendants"), move to dismiss on a variety of grounds. (DE 42). I will grant their motion to dismiss on some of those grounds, enumerated below.

Defendant Soaring Heights separately moves to dismiss Count VI pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 20. (DE 43). I will grant Soaring Heights's motion and dismiss the claim against it.

Defendants Peaceful Healing and Dr. Sigafoos have not, to date, made an appearance in this case. (*See* DE 1 through DE 49). Defendant Dr. Federici answered an earlier iteration of the Complaint (DE 24) but has not otherwise moved or joined in these motions. (*See* DE 24 through DE 49).

## II.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

Motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) may be raised at any time. *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 437-38 (D.N.J. 1999). Such Rule 12(b)(1) challenges may be either facial or factual attacks. *See* 2 Moore's Federal Practice § 12.30(4) (3d ed. 2007); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). A facial challenge asserts that the complaint does not allege sufficient grounds to establish subject matter jurisdiction. *Iwanowa*, 67 F.Supp.2d at 438. "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)). The standard on a facial attack, then, is similar to the one that would govern an ordinary Rule 12(b)(6) motion.

A factual attack, on the other hand, permits the Court to consider evidence extrinsic to the pleadings. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), *holding modified on other grounds by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003). In that context, "Rule 12(b)(1) does not provide plaintiffs the procedural safeguards of Rule 12(b)(6), such as assuming the truth of the plaintiff's allegations." *CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008). For further explication of the distinction between a facial and a factual attack, *see Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015).

### III. Analysis

#### a. The State Defendants' Motion to Dismiss

##### i. *Rooker-Feldman*

Defendants argue that the Court lacks jurisdiction to hear the plaintiffs' claims under the *Rooker-Feldman* doctrine.[5] (DE 42-1 at 31). They describe plaintiffs as state court losers impermissibly seeking federal district court review of adverse custody rulings. Plaintiffs assert that there have not been final judgments from the family court and that in any event they are challenging general procedures, not rulings, and that therefore the doctrine does not apply. (DE 44 at 32).

I agree that *Rooker-Feldman* does not apply. Indeed, this court has so held in a prior decision in a similar case brought by these plaintiffs, upheld by the Third Circuit. *See Allen v. DeBello*, 861 F.3d 433, 437 (3d Cir. 2017) (consolidated appeal, affirming dismissals in *Allen v. Bello*, No. 14-0760, 2016 WL 1670927 (D.N.J. Apr. 27, 2016); *Edelglass v. New Jersey*, No. 14-760, 2015 WL 225810 (D.N.J. Jan. 16, 2015)). Because "plaintiffs do not challenge the state court custody decisions themselves, but instead the policies underlying those decisions" the doctrine does not apply here. *Allen*, 861 F.3d 433, 438.

Under the *Rooker-Feldman* doctrine, district courts are prohibited from exercising jurisdiction over "'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 164 (3d Cir. 2010) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The doctrine has "narrow applicability." *Allen*, 861 F.3d 433, 438.

Four requirements must be met in order for the doctrine to bar suit: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries

---

[5]     The reference is to *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Id.* at 165.

Here, the plaintiffs insist that they are not attempting to appeal a final state court judgment to this court; rather, they say, they are generally challenging the constitutionality of the procedures employed by the state court in making custody determinations—particularly, the denial of plenary hearings. The Third Circuit in *Allen*—which involved similar claims by Malhan and Shaikh that the New Jersey custody system violated due process standards—addressed whether the *Rooker-Feldman* doctrine applies. In finding that the doctrine did not bar the plaintiffs' suit, it reasoned as follows:

> [ ] Plaintiffs here are not challenging the state court judgments, but the underlying policy that governed those judgments: the alleged policy of the New Jersey state courts of stripping parents of custody, in favor of the other parents, without a plenary hearing and employing an allegedly improper best-interests-of-the-child standard in such proceedings. Thus, *Rooker-Feldman* does not bar suit.

*Allen*, 861 F.3d 433, 439. [6]

The same can be said in this case. The plaintiffs are asking this court to jump into an ongoing dispute over state court procedures—problematic,

---

[6]    Plaintiffs explicitly state in their brief that their grievance is with the alleged "ongoing violations of due process by the defendants" generally and not the particular orders in their family court matters. (*See* DE 44 at 38 ("Plaintiffs do not seek to vacate or reverse any existing state court decisions or even orders, custody or otherwise.")).

In the *Allen* appeal upholding the dismissal of two of the prior cases, the Court described the New Jersey courts' policy regarding hearings:

> [A] plenary hearing is not required in every contested motion in New Jersey state court; a trial judge has discretion to decide such a motion without a hearing. [citing *Shaw v. Shaw*, 138 N.J. Super. 436, 351 A.2d 374, 376 (Ct. App. Div. 1976)]. "It is only where the affidavits show that there is a genuine issue as to a material fact, and that the trial judge determines that a plenary hearing would be helpful in deciding such factual issues, that a plenary hearing is required." [citing *id.*; *Lepis v. Lepis*, 83 N.J. 139, 416 A.2d 45, 55 (1980)].

*Allen*, 861 F.3d at 437 (footnotes omitted).

perhaps, for other reasons, but not for this one. Following *Allen,* I hold that the *Rooker-Feldman* doctrine is not a bar to plaintiffs' suit.

### ii. *Younger* abstention

Defendants ask the Court to refrain from hearing this case under the *Younger* abstention doctrine.[7] (DE 42-1 at 46). *Younger* abstention requires dismissal of certain federal claims for injunctive or declaratory relief that would interfere with pending state court proceedings. *See Younger,* 401 U.S. at 41; *Samuels v. Mackell,* 401 U.S. 66, 73 (1971) ("[W]here an injunction would be impermissible under [*Younger's*] principles, declaratory relief should ordinarily be denied as well."); *Moore v. Sims,* 442 U.S. 415, 423–26 (1979). This doctrine "reflects a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Cresci v. BCB Community Bank,* 728 F. App'x 145, 148 (3d Cir. 2018) (quoting *Gwynedd Properties, Inc. v. Lower Gwynedd Twp.,* 970 F.2d 1195, 1200 (3d Cir. 1992)).

*Younger* is based on principles of federalism and comity. A federal court should not abstain "simply because a pending state-court proceeding involves the same subject matter." *Sprint Communications, Inc. v. Jacobs,* 571 U.S. 69, 72 (2013). However, there are "certain instances in which the prospect of undue interference with state proceedings counsels against federal relief." *Id.* The Supreme Court has extended *Younger* abstention "to particular state civil proceedings...that implicate a State's interest in enforcing the orders and judgments of its courts." *Id.* at 72–73. Those circumstances are "exceptional" and are limited to the following three categories "(1) state criminal prosecutions; (2) civil enforcement proceedings; and (3) civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* at 78; *see also Hamilton v. Bromley,* 862 F.3d 329, 337 (3d Cir. 2017).

Again, the Third Circuit has already addressed this issue in *Allen.* 861 F.3d 433, 439 n.20. The Third Circuit in *Allen* held that *Younger* abstention did

---

[7]     The reference is to *Younger v. Harris,* 401 U.S. 37 (1971).

not bar review of that case "for the same reasons cited by the District Court." *Id.* The district court in *Edelglass* (one of the two cases consolidated for appeal in *Allen*) reasoned that *Younger* abstention was inappropriate because "[t]he Family Court proceedings underlying the present case do not fall under any of the three categories delineated by the Supreme Court in *Sprint.*" *Edelglass*, 2015 WL 225810, at *11 (D.N.J. Jan. 16, 2015), *aff'd sub nom. Allen*, 861 F.3d 433 (3d Cir. 2017). The District Court explained why none of the *Sprint* categories applied:

> These proceedings were not criminal proceedings. Nor were they civil enforcement proceedings, as there was no claim that Plaintiffs violated any civil statute. Finally, the Family Court proceedings and orders at issue here are not analogous to contempt hearings, and therefore do not fall into the category of proceedings which further the state's ability to perform judicial functions. As the case does not fall into any of the "exceptional" categories to which *Younger* abstention applies, Defendants' motion to dismiss the case on this ground is denied.

*Id.*

The same can be said here. I agree that, for the reasons enunciated in *Edelglass* and affirmed in *Allen*, this case does not fall into any of the three *Sprint* categories. I therefore hold that *Younger* abstention is not appropriate.

### iii. State Court Judges as Proper Defendants

Defendants Judge Katz, Judge Kessler, and Judge Wilson assert that they were acting in an adjudicative capacity and therefore are not amenable to suit under § 1983. (DE 42-1 at 38). I agree.

When judges are the defendants in a § 1983 case, a threshold issue is whether the judges are "sued in their judicial capacity as neutral adjudicators of disputes." *Georgevich v. Strauss*, 772 F.2d 1078, 1087 (3d Cir. 1985); *Allen v. DeBello*, 861 F.3d 433, 440 (3d Cir. 2017) ("[A] judge who acts as a neutral and impartial arbiter of a statute is not a proper defendant to a Section 1983 suit challenging the constitutionality of the statute."). "[T]he factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his

[or her] judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S. Ct. 1099, 1107 (1978).[8]

The seminal case on this subject is *In re Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17 (1st Cir.1982) (hereinafter, "*In re Justices*").[9] In that case, five attorneys sued the Justices of the Supreme Court of Puerto Rico, challenging the constitutionality of the state statutes requiring members of the bar to pay dues. *In re Justices*, 695 F. 2d at 18–19. The defendant Justices sought a writ of mandamus from the First Circuit that would compel the district court to dismiss the complaint. They argued that the Justices and the plaintiffs did not have "adverse legal interests, [because] the Justices' only function concerning the statutes being challenged [was] to act as neutral adjudicators rather than as administrators, enforcers, or advocates." *In re Justices*, 695 F.2d 17, 21.

The First Circuit agreed that the Justices' role with respect to the statutes in question was adjudicative. "[T]he Justices act as they would in any other case based upon a Commonwealth statute: they sit as adjudicators, finding facts and determining law in a neutral and impartial judicial fashion." *Id.* Granting in part the Justices' petition for a writ of mandamus, the First Circuit reasoned as follows:

> Judges sit as arbiters without a personal or institutional stake on either side of the constitutional controversy. They are sworn to uphold the Constitution of the United States. They will consider and decide a claim that a state or Commonwealth statute violates the federal Constitution without any interest beyond the merits of the case. Almost invariably, they have played no role in the statute's enactment, they have not initiated its enforcement, and they do not even have an institutional interest in following their prior decisions (if any) concerning its constitutionality if an authoritative contrary legal determination has

---

8    The issue is distinct from that of judicial immunity, but not unrelated.

9    The U.S. Court of Appeals for the Third Circuit has twice recognized *In re Justices* as the "seminal case" in this area. *See Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 198 (3d Cir. 2000) (hereinafter, "*Reynolds*"); *Allen*, 861 F.3d at 440.

subsequently been made (for example, by the United States Supreme Court).

*Id.*

Consequently, § 1983 "does not provide relief against judges acting purely in their adjudicative capacity, any more than, say, a typical state's libel law imposes liability on a postal carrier or telephone company for simply conveying a libelous message." *In re Justices*, 695 F.2d 17, 22.[10] The Third Circuit has cited *In re Justices* with approval and, while acknowledging that judges can be amenable to suit under § 1983 in the appropriate circumstances, it "recognized the impropriety of such suits where the judge acted as an adjudicator rather than an enforcer or administrator of a statute." *Reynolds*, 201 F.3d 194, 199 (citing *Georgevich*, 772 F.2d 1078).

In *Reynolds*, 201 F.3d 194, the Third Circuit considered whether judges were proper defendants to a § 1983 suit challenging the constitutionality of a Pennsylvania state statute that authorized the commitment of minors to involuntary drug and alcohol treatment services. *Id.* at 195. In affirming the district court's dismissal of the action on the ground that the judges were "neutral adjudicators and not enforcers or administrators," and thus not proper defendants, the Third Circuit noted that the judges had to determine "mixed question[s] of law and fact typical to the adjudicative setting." *Id.* at 199. For the same reasons stated by the First Circuit in *In re Justices*, the Third Circuit likewise did not rule directly on the question of constitutional Article III standing. Instead it held that the judges were acting in their capacity as neutral adjudicators, which meant that the plaintiffs had failed to state a claim for which relief could be granted. *Id.* at 200; *In re Justices*, 695 F.2d 17,

---

[10]     The rationale for this holding is also based on prudential concerns over the institutional neutrality of the judiciary. "To require the Justices unnecessarily to assume the role of advocates or partisans on these issues would tend to undermine their role as judges. To encourage or even force them to participate as defendants in a federal suit attacking Commonwealth laws would be to require them to abandon their neutrality and defend as constitutional the very laws that the plaintiffs insist are unconstitutional—laws as to which their judicial responsibilities place them in a neutral posture." *In re Justices*, 695 F.2d 17, 25.

25 ("[W]e need not reach the Article III question directly here, for in light of [the cited] cases, and in light of the fact that the plaintiffs have made no representations in their complaint or in argument before us concerning a genuine risk of enforcement by the Justices, the plaintiffs' complaint does not state a claim against the Justices in their enforcement capacity." (internal citation omitted)).

By contrast, in *Georgevich,* the Court of Appeals permitted suit to go forward against certain state court judges who acted in an administrative capacity with respect to the parole system. The court observed that "[t]he Pennsylvania statutory arrangement divides the authority to make parole decisions between the sentencing judges and the Board." 772 F.2d at 1087. Thus, there was "no basis for distinguishing the role of the sentencing judges from that of the Board" and "no reason why the Board, but not the judges, may be sued on a similar challenge." *Id.* at 1088. "This is not a case," the Court wrote, "in which judges are sued in their judicial capacity as neutral adjudicators of disputes.... Rather, the judges are sued as enforcers of the statutes, in other words as administrators of the parole power." *Id.* at 1087.

This case clearly falls on the *Reynolds* side of the *Reynolds/Georgevich* divide.

Indeed, the federal courts have already considered this question in three substantially similar cases filed by two of the same plaintiffs here. In *Edelglass v. New Jersey*, No. 14-760, 2015 WL 225810, at *1 (D.N.J. Jan. 16, 2015), Malhan, Shaikh, and others brought a § 1983 suit against several state court judges challenging the constitutionality of New Jersey's procedures for handling custody disputes between parents. In *Allen v. Bello*, No. 14-760, 2016 WL 1670927, at *1 (D.N.J. Apr. 27, 2016), Shaikh and others sued state court judges seeking to "dramatically change the legal landscape of New Jersey and the laws governing child custody proceedings between parents." The district court, per Judge Wolfson, granted motions to dismiss in both cases: *Edelglass*, 2015 WL 225810, at *1; *Allen*, 2016 WL 1670927, at *13. The challenge to

procedures such as the denial of plenary hearings, she wrote, directly implicated the adjudicative function:

> [T]he actions of the Defendant Judges in applying [the best interests of the child] standard to the Plaintiffs' custody disputes is in the nature of an adjudicative function. Similarly, the fact that several of the 'laws' concerning adequate notice, the right to counsel, and the right to a plenary hearing are not embodied in legislative enactments, but rather in court rules promulgated by the New Jersey Supreme Court and in binding judicial decisions from appellate courts interpreting the relevant constitutional provisions, does not vest these Defendant trial court judges with any adversarial interest in defending the constitutionality of these rules of law.

*Allen*, 2016 WL 1670927, at *13.

The *Allen* and *Edelglass* cases were consolidated for appeal and the Third Circuit affirmed both dismissals. *Allen*, 861 F.3d 433, 436. The Third Circuit directly addressed the question of "whether these state court judges are proper defendants in this Section 1983 suit." *Id.* at 433. Its holding left no doubt that "the Defendants here are not proper parties to this action under Section 1983 for declaratory or injunctive relief." *Id.* at 442. *Allen* treated, *inter alia,* a challenge like the one asserted here—*i.e.,* that the state court procedures unfairly denied evidentiary hearings. In this case, as in *Allen,* the state family court judges were acting in their adjudicative capacities and not in administrative or enforcement capacities.

Here, as in *Allen,* the plaintiffs—indeed, the same plaintiffs—broadly challenge the manner in which the New Jersey state courts make custody determinations. The judges, however, are not adversary parties: "a parent must initiate a custody dispute," and "the state court judges themselves do not have any right to initiate these actions." The defendant state court judges are not challenged in relation to "any administrative function," and "the [defendant] state court judges did not promulgate either the statutes or the judicial standards to which the plaintiffs object." In addition, "where the judge determines that there is a genuine issue as to a material fact relating to the

29

custody dispute, a plenary hearing must be held, providing plaintiffs with additional procedural safeguards." *Allen*, 861 F.3d at 442. Consequently, the state court judges here "are not proper parties to this action under Section 1983 for declaratory or injunctive relief." *Id*.[11]

Plaintiff Shaikh brought yet a third constitutional challenge to New Jersey's child custody dispute framework in this federal district court. In it, he asserted that "he suffered a violation of his due process rights under the Fourteenth Amendment because the New Jersey family court has the ability to modify his custody arrangement without holding a plenary hearing." *Hagberg v. New Jersey*, 751 F. App'x 281, 287 (3d Cir. 2018). The district court via Judge Martinotti dismissed the claim and the Third Circuit affirmed, noting that the district court "was correct to deny Shaikh injunctive and declaratory relief."

This case is identical to the earlier ones in every way that matters.[12] I therefore follow the lead of Judges Wolfson and Martinotti in the affirmed *Allen, Edelglass,* and *Hagberg* decisions. The § 1983 claims for injunctive and declaratory relief against Judge Katz, Judge Kessler, and Judge Wilson in Count I are dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). These dismissals are with prejudice because amendment would be futile. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004).

---

[11]     This case stands on a different footing, however, from two of the other federal suits Malhan brought in which he challenged a gag order that the state court judge issued during his custody dispute. *See Argen v. Kessler*, No. 18-963 (KM), 2019 WL 2067639, at *1 (D.N.J. May 10, 2019), and 2018 WL 4676046 (KM), at *1 (D.N.J. Sept. 28, 2018); *Nichols v. Sivilli*, No. 14-3821 (WJM), 2014 WL 7332020, at *1 (D.N.J. Dec. 19, 2014). In those cases, the district courts held that the respective judges were proper defendants for potential declaratory relief under § 1983 since those judges acted as enforcers or administrators of the gag order in question because they "drafted the terms of the Gag Order" and had "adverse legal interests to a party who [sought] to challenge the Gag Order." *Id.* Those cases are distinguishable from the plaintiffs' current case, which is based on generalized challenges to the New Jersey custody determination process. Therefore, the state judge defendants here are not similarly situated to those in *Argen* and *Nichols* for purposes of whether the judges acted as adjudicators, administrators, or enforcers.

[12]     The claim-preclusive implications of those earlier actions are addressed in Subsection III.a.iv., immediately following.

#### iv. *Res Judicata* (Claim Preclusion)

As noted, the current action is not the first time that Plaintiffs Malhan and Shaikh have asserted that the procedures for making custody determinations in New Jersey family court proceedings violate due process standards. *See Hagberg v. New Jersey*, 751 F. App'x 281 (3d Cir. 2018) (*aff'g Hagberg v. New Jersey*, No. 16-1189, 2017 WL 4270524 (D.N.J. Sept. 26, 2017)); *Allen v. DeBello*, 861 F.3d 433 (3d Cir. 2017) (*aff'g Allen v. Bello*, No. 14-760, 2016 WL 1670927 (D.N.J. Apr. 27, 2016); *Edelglass v. New Jersey*, No. 14-760, 2015 WL 225810 (D.N.J. Jan. 16, 2015)). Defendants contend that those prior decisions bar Malhan's and Shaikh's claims here under the doctrines of "res judicata and/or collateral estoppel." (DE 42-1 at 52–54; DE 46 at 14).[13]

In Section III.a.iii, *supra,* I treated the prior *Allen, Edelglass,* and *Hagberg* cases, affirmed by the Third Circuit, as persuasive authority. Actually, they are more than that. These were very similar actions brought by Malhan and Shaikh, two of the plaintiffs here, in which substantially similar claims were denied. If Count I had passed the § 1983 bar on suits against judges in their adjudicative capacities, I would dismiss the challenges to the adequacy of family court procedures, asserted against the state judges in Count I, on the alternative basis of res judicata as to Malhan and Shaikh.

"The federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel,

---

[13]     Defendants do not separately analyze the doctrines of claim and issue preclusion, but instead assert in a catchall fashion that "res judicata and/or collateral estoppel bar the claims by Malhan and Shaikh." (DE 42-1 at 52–54; DE 46 at 14). It is fair to say, however, that their analysis centers around the doctrine of claim preclusion. (*See* DE 42-1 at 54 ("Malhan and Shaikh appear to be asserting nearly <u>identical</u> claims to those previously made, and dismissed, in those Plaintiffs' prior federal court actions that concerned custody decisions in their state court cases." (emphasis in original))). Consequently, I put aside the issue preclusion inquiry and focus solely on claim preclusion.

once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 414 (1980) (internal citation omitted).

The doctrine of res judicata (also known as claim preclusion) applies when three conditions are present: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008). "The doctrine of res judicata bars not only claims that were brought in a previous action, but also claims that could have been brought." *Id.*

I find that the § 1983 claims of Malhan and Shaikh that the New Jersey family court system violates federal due process standards is barred by the doctrine of claim preclusion. In *Edelglass,* Malhan, Shaikh, and a group of similarly situated plaintiffs sued several state court judges under § 1983 alleging "constitutional infirmities in the State of New Jersey's procedures for handling custody disputes between parents." *Edelglass*, 2015 WL 225810, at *1. Count 1 in that suit alleged that the plaintiffs had "been deprived of fundamental rights without due process." *Id.* The defendants included the State of New Jersey, the Clerk of the Superior Court of New Jersey, and several New Jersey Family Part judges. *Id.* The *Edelglass* court described the "allegedly unlawful acts at issue" as "either the alleged absence of plenary hearings or the issuance of the orders that followed." *Edelglass*, 2015 WL 225810, at *18. Malhan's due process claim was dismissed with prejudice on statute of limitations grounds. *Id.* Shaikh was not specifically mentioned in the *Edelglass* motion to dismiss opinion, but he is listed as a plaintiff in the operative complaint. *See* 3:14-cv-00760 (FLW) (DEA) at DE 30 ¶¶ 14, 239–63 (hereinafter, *Edelglass* Complaint).

I start with the third claim preclusion requirement ("same cause of action"). Several factors bear on the determination of whether the causes of action are sufficiently alike: "(1) whether the acts complained of and the

demand for relief are the same ...; (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same ...; and (4) whether the material facts alleged are the same. It is not dispositive that a plaintiff asserts a different theory of recovery or seeks different relief in the two actions." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 277 (3d Cir. 2014) (internal quotation and citation omitted).

Shaikh and Malhan's due process claim in *Edelglass* involves the same cause of action as their due process claim here: both are claims under 42 U.S.C. § 1983 for violation of Fourteenth Amendment due process. *See Edelglass* Complaint ¶¶ 1, 19. Both cases assert the same alleged grievance—that the plaintiffs did not receive a plenary hearing, adequate notice, or a meaningful review of the evidence they submitted during their New Jersey family court custody disputes. The overlap is apparent from a comparison of the complaints in the two cases. In *Edelglass*, Malhan and Shaikh alleged as follows:

> 2. [Plaintiffs seek declaratory and injunctive relief against defendants] who, under color of law, unconstitutionally interfered with the fundamental rights to the care, custody and control of children without a full hearing in violation of the Fourteenth Amendment.
> ...
> 19. Defendants have established policies, procedures, and precedents denying parents a full and prompt hearing when stripping one parent of physical and legal custody and giving full physical and legal custody to another parent. This is a clear violation of the Fourteenth Amendment to the United States' Constitution under color of law.
> ...
> 181. Malhan told the court that he wished to present evidence to refute the allegations made by Myronova, specifically he stated that he had audio recordings, photographs and videos which could document his ability to parent and would show that Myronova was lying. The court did not permit Malhan to present any evidence at this proceeding.
> ...
> 186. ...On April 1, [2011] the court still did not permit Malhan to cross examine Myronova and there was no plenary hearing.
> ...
> 278. New Jersey and individual Defendants violated the substantive and procedural rights of Plaintiffs by interfering with the care, custody and control of minor children without affording Plaintiffs the most basic

due process rights, including adequate notice, the right to counsel, the right to cross examine accusers, and the right to present evidence in one's defense.

*Edelglass* Complaint.

In several other paragraphs in the *Edelglass* Complaint Malhan repeatedly complains of not receiving a plenary hearing during his custody proceedings. *Edelglass* Complaint ¶¶ 187, 190, 191, 198, 201. The factual allegations involving Shaikh in the *Edelglass* Complaint are at times verbatim copies of the factual allegations in the current Complaint, both of which complain of not receiving a plenary hearing. *Compare Edelglass/Allen* Complaint ¶¶ 239–63, *with* Comp ¶¶ 396–438.

The district court's motion-to-dismiss opinion in *Allen* notes that it is "a substantially identical matter" to *Edelglass. Allen*, No. 14-0760, 2016 WL 1670927 at *1. The District Court dismissed a complaint that sought "to have this Court dramatically change the legal landscape of New Jersey and the laws governing child custody proceedings between parents." *Id.* In *Allen*, the plaintiffs sued the state court judges "who have presided over their child custody cases." *Id.* Plaintiffs in that suit also contended, *inter alia*, that they had a constitutional right to a plenary hearing in custody disputes. *Id.* The Third Circuit affirmed the District Court's dismissals in both *Allen* and *Edelglass* in a consolidated opinion. *Allen v. DeBello*, 861 F.3d 433, 433 (3d Cir. 2017). The factual allegations in the *Allen* Complaint involving Shaikh are at times verbatim copies of the factual allegations in the current Complaint, and both complain of denial of a plenary hearing. *Compare* 3:15-cv-3519 at DE 1 (*Allen* Complaint) ¶¶ 140–64 *with* Comp ¶¶ 396–438.

The Complaint in the current case contains many of the same allegations made in the *Edelglass/Allen* Complaints noted above. *See* Section I (Factual Summary), *supra*. This satisfies the third claim preclusion requirement because Malhan and Shaikh's § 1983 claim here is plainly "a subsequent suit based on the same cause of action" as the prior suits. *In re Mullarkey*, 536 F.3d 215, 225. True, there may be minor differences in the exact facts alleged and

the particularities of the incidents where the plaintiffs believe they should have been due a plenary hearing. Still, it must be remembered that this is a systemic challenge to the adequacy of the state court procedures, not an appeal from any particular ruling. Viewed as such, it is the same claim. The Third Circuit urges courts to "take a broad view of what constitutes the same cause of action and that res judicata generally is thought to turn on the *essential similarity* of the underlying events giving rise to the various legal claims." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 277 (3d Cir. 2014) (internal quotations and citations omitted); *Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 174 (3d Cir. 2009) ("The fact that several new and discrete discriminatory events are alleged does not compel a different result."). A broad view of the two cases strongly supports a finding that the prior suits in *Edelglass/Allen* involved essentially the same cause of action that is asserted here.

Plaintiffs' constitutional claims do not become new for purposes of claim preclusion merely because they allege subsequent instances of the supposed constitutional violation that was initially litigated. "A suit can be claim precluded even if it is based in part on facts that occurred after the initial suit." *Amid v. Chase*, 720 F. App'x 6, 10 (2d Cir. 2017) (citing *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 110–13 (2d Cir. 2000)) (holding that the "essential" facts of plaintiff's claim existed at the time of her original suit and were therefore precluded even though plaintiff alleged factual content that occurred subsequent to the initial judgment). The case here asserts a systemic constitutional grievance that was already litigated, adding allegations of similar examples of the same constitutional harm. Because the claim here involves "nothing more than additional instances of what was previously asserted" it is subject to a claim preclusive bar. *Waldman*, 207 F.3d 105, 113.[14]

---

[14]     It is therefore to be contrasted with a damages case alleging new and distinct damages that later arose from conduct that was already litigated. *See Holland v. Cty. of Los Angeles*, No. 12-0461, 2012 WL 12930525, at *4 (C.D. Cal. June 11, 2012) (citing *Zenith Radio Com. v. Hazeltine Research, Inc*, 401 U.S. 321, 338 (1971)).

I turn to the first requirement (whether there was a final judgment on the merits in a prior suit). Plaintiffs assert that the prior judgments were not on the merits because "none of the substantive issues were discussed." (DE 44 at 44). That is incorrect. The District Court in *Edelglass* dismissed Malhan's § 1983 claim on statute of limitations grounds, *Edelglass*, 2015 WL 225810, at *1. The District Court in *Allen* held that the state court judges were not proper defendants under § 1983. *Allen*, No. 14-0760, 2016 WL 1670927, at *14–15. The Third Circuit in *Allen* affirmed on both bases. It specifically upheld dismissal on the basis of the state court judges not being eligible defendants under § 1983, the very thing I am holding here. *Allen*, 861 F.3d 433, 433.

These substantial prior decisions constitute final judgments on the merits. *See Singer v. Bureau of Prof'l & Occupational Affairs*, 648 F. App'x 193, 194 (3d Cir. 2016) ("[T]he fact that the claims were previously dismissed as time-barred does not prevent application of claim preclusion."); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 228, 115 S.Ct. 1447 (1995) ("The rules of finality, both statutory and judge made, treat a dismissal on statute-of-limitations grounds the same way they treat a dismissal for failure to state a claim, for failure to prove substantive liability, or for failure to prosecute: as a judgment on the merits."). Consequently, the first requirement for claim preclusion is satisfied.

Finally, I discuss the second requirement (same parties or their privies). Plaintiffs contend that the defendants in the prior suits were different. (DE 44 at 42). Specifically, Malhan stressed that he previously sued the prior judge assigned to his case, not the newly-assigned Judge Katz, "so the doctrine cannot possibly apply to Judge Katz." (*Id.*). This argument ignores the fact that the second claim preclusion requirement applies not only to the same parties but also to their privies. *In re Mullarkey*, 536 F.3d 215, 225.

"Privity" is defined as "[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece of property); mutuality of interest."

*Mayercheck v. Mayercheck/Tucciarone*, No. 14-611, 2015 WL 1000159, at *8 (W.D. Pa. Mar. 5, 2015) (quoting Black's Law Dictionary (9th ed. 2009)). Privity "is merely a word used to say that the relationship between one who is a party on the record and another is close enough to include that other within the res judicata." *E.E.O.C. v. U.S. Steel Corp.*, 921 F.2d 489, 493 (3d Cir. 1990) (internal citation omitted). "[P]rivity requires a prior legal or representative relationship between a party to the prior action and the nonparty against whom estoppel is asserted." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 312 (3d Cir. 2009).

In *Edelglass*, Malhan named as defendants two family part judges, Judge Maureen Sogluizzo and Judge Nanci Sivilli, who previously presided over his divorce and custody disputes. *Edelglass Complaint* ¶¶ 16, 180, 183, 195. He now names two family part judges, Judge Katz and Judge Kessler, who subsequently presided over his family court dispute. (Comp ¶¶ 15, 17, 37). In *Allen*, Shaikh named as a defendant the family part judge, Judge Einbinder, who presides over his family court proceedings. *Compare* 3:15-cv-3519 at DE 1 ¶¶ 11, 144 *with* Comp ¶¶ 400, 404, 410, 414–18.

The judges in this case stand in privity with the judges in Malhan and Shaikh's prior suits. *See Taylor v. Sturgell*, 553 U.S. 880, 893, 128 S. Ct. 2161, 2172 (2008); *Randles v. Gregart*, 965 F.2d 90, 93 (6th Cir. 1992); *Mayercheck*, 2015 WL 1000159, at *8. The legal interests of the judges in both suits are identical. *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 311 (3d Cir. 2009) (citing *Greenway Ctr. Inc. v. Essex Ins. Co.*, 475 F.3d 139 (3d Cir.2007)). That is especially true because, as pointed out several times above, this case is a challenge to the family court procedures themselves. Therefore, the second requirement for claim preclusion is met.

Because all three requirements for claim preclusion are satisfied, Malhan and Shaikh's § 1983 due process claim is barred by res judicata and would be dismissed with prejudice on this alternative basis.[15]

### v.    The Workability of the Relief Sought

Defendants generally contend that the relief plaintiffs seek in Count I is unworkable. The relief sought, they say, is vague, and the implications wide-ranging. (DE 42-1 at 49–52). If the claims were stronger on the merits, this factor would perhaps fade in significance; as it is, however, I agree.

Defendants first contend that it "is apparent from the recitation of the request for relief" in the Complaint that the requested order is inappropriate. Plaintiffs request that the Court permanently enjoin "the Defendants and all persons in concert with them, and their successors in office, from. . . refusing to provide parents with adequate notice and a meaningful hearing at a

---

[15]    Shaikh also brought suit in *Hagberg* against the State of New Jersey, then-Governor Christie, then-Attorney General Porrino, the Clerk of the New Jersey Superior Court, and New Jersey Supreme Court Chief Justice Rabner. *Hagberg*, 751 F. App'x 281 (3d Cir. 2018); *Hagberg*, No. 16-1189, 2017 WL 4270524 (D.N.J. Sept. 26, 2017). In that action, plaintiffs Shaikh and Karl Hagberg sued under § 1983, "[e]ach alleg[ing] that their Fourteenth Amendment right to due process was violated because his parenting time with his minor children was limited without a full and prompt hearing." *Hagberg*, No. 16-1189, 2017 WL 4270524, at *1. Plaintiffs sought to "enjoin New Jersey courts from reducing a parent's legal custody of children without a plenary hearing within ten days" and "declare Plaintiffs have fundamental rights to custody of their children that cannot be taken away without due process." *Id.*

Shaikh initially filed the *Hagberg* action against Judge Marlene Lynch Ford, a New Jersey Superior Court Judge who presided over his custody proceedings at the time. *Id.* The District Court via Judge Martinotti dismissed the claims against Judge Ford and ordered Shaikh to amend his complaint following its dismissal to remove Judge Ford, which Judge Martinotti also deemed appropriate in light of Judge Wolfson's dismissal order in *Allen* that Judge Martinotti described as a "virtually identical case[]." *Id.*

The District Court in *Hagberg* provided a reasoned analysis as to why Shaikh's due process claim under the Fourteenth Amendment ought to be dismissed and why Shaikh was not entitled to a plenary hearing for every contested motion in New Jersey state court. *Id.* at *7, *9–10. The Third Circuit affirmed that dismissal with its own detailed analysis. *Hagberg*, 751 F. App'x 281 (3d Cir. 2018). For the reasons described in this Subsection, the *Hagberg* case also meets the requirements for claim preclusion against Shaikh and his due process claim. Consequently, this provides another alternative basis to dismiss Shaikh's claim in Count 1 with prejudice.

meaningful time following the removal of children from their homes by state officials in a manner consistent with the Due Process Clause." (Comp at pp. 104–05). As the defendants accurately point out, the judicial defendants "are already obligated by New Jersey law to abide by Due Process Clause requirements with respect to any litigants." (DE 42-1 at 50). Therefore, "this vague demand would merely require New Jersey state court judges to do what the law already requires them to do." (*Id.*).

Moreover, to the extent that any state court litigant might claim that a state court judge failed to comply with all constitutional requirements, the state court system offers a full opportunity for a dissatisfied litigant to resort to the state appellate courts. The entry of such an order would almost certainly result in a flurry of federal suits that the rulings in state courts violated the federal order, with likely clarifications sought for the meanings of "adequate notice" and a "meaningful" hearing within a "meaningful" time. (Comp at pp. 104–05).

The U.S. Supreme Court has made clear that such a scenario is neither permissible, nor preferable. In *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974), the Court explained that federal courts should not enter orders "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future" state court proceedings. *O'Shea v. Littleton*, 414 U.S. 488, 500, 94 S. Ct. 669, 678 (1974). In short, a federal district court is not to appoint itself a *de facto* court of appeal to correct errors in state court proceedings.

An order that "would contemplate interruption of state proceedings to adjudicate assertions of noncompliance" with the order would be an impermissible "ongoing federal audit" of the state proceedings that would require a district court "to sit in constant day-to-day supervision" of state court judges. *Id.* at 501 (noting that an order of this type "would disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim ab initio"). "A federal court should not intervene to

establish the basis for future intervention that would be so intrusive and unworkable." *Id.; see also Hagberg*, 751 F. App'x 281, 287 (noting that "it is not the job of the federal court to sit in constant supervision of the New Jersey family court, which would essentially 'transform federal courts into family courts.'" (quoting *Brittain v. Hansen*, 451 F.3d 982, 995 (9th Cir. 2006)).

Consequently, as an alternative ground for dismissal, I find that the relief plaintiffs seek in Count I is vague and unworkable, and therefore fails to state a claim for which relief could be granted pursuant to Fed. R. Civ. P. 12(b)(6).

### vi.    Right to Record (Count II)

Plaintiffs request that this Court enter a blanket order that permits litigants involved in family court disputes to record events that might be pertinent to their custody disputes. (*See* Comp ¶¶ 490–523). Specifically, plaintiffs seek a declaratory judgment "that declares as a matter of law that parents in a custody dispute have a First and Fourteenth Amendment Right to collect evidence and document their interaction with their children." (*Id.*).

To begin with, I see no constitutional basis for the claim. There is no constitutional "right to record" as such. If people do not wish to be recorded, it is usually their prerogative to decline.

Defendants also correctly assert that this particular issue does not present an Article III case or controversy. (DE 42-1 at 55). *See United States v. Thomas*, 713 F.3d 165, 168 (3d Cir. 2013) ("A judicial decision rendered in the absence of a case or controversy is advisory, and federal courts lack power to render advisory opinions."). Plaintiffs have not established any ongoing injury in fact with respect to any theoretical refusal to permit them to record.

The judicial defendants are not alleged to have entered any order or promulgated a policy forbidding the recording of interactions. One or more of the other defendants, in plaintiffs' view, have at times resisted the recording of their interactions with the plaintiffs (usually unsuccessfully, or only to relent

later).[16] Even under the dubious assumption that they had no right to resist being recorded, that would not be enough to demonstrate a present case or controversy. *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S. Ct. 669, 676 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects.").

Moreover, plaintiffs' requested relief is too broad and non-specific to sufficiently state a claim. Issuing such a wide-ranging order for all "parents in a custody dispute" involving all interactions involving their children is inappropriate. It is unworkable in light of uncertainty as to where, to whom, and under what circumstances it would apply. Consequently, this claim is dismissed for failure to state a claim and for lack of subject matter jurisdiction.

This dismissal of Count II is without prejudice.

### vii. Claim of retaliation against Judge Kessler (Count V)

Count V is a composite of claims, one of which is Malhan's claim of "retaliation" against Judge Kessler. It must be dismissed on the grounds stated in Section III.a.iii, *supra* (judges not proper § 1983 defendants). It must also be dismissed based on this judicial officer's absolute immunity from claims for monetary damages. (DE 42-1 at 56; Comp ¶¶ 558–80). Consequently, I will dismiss Count V as to Judge Kessler with prejudice.

Judges have absolute judicial immunity from suit for compensatory or punitive damages based on the performance of their judicial functions. *Briscoe v. LaHue*, 460 U.S. 325, 334, 103 S. Ct. 1108, 1115 (1983) ("state judges are absolutely immune from liability for their judicial acts"); *Azubuko v. Royal*, 443 F.3d 302, 303 (3d Cir. 2006) ("A judicial officer in the performance of his [or her] duties has absolute immunity from suit and will not be liable for his [or

---

[16]     Malhan did allege that Ms. Daru of Peaceful Healing told him that he was not allowed to record their supervised visit. *See* Subsection II.b.ii., *supra*. However, this did not stop Malhan from recording and he does not allege that there were any direct injuries as a result of him recording their encounter. *Id.* This is not enough to allege an injury in fact for standing purposes.

her] judicial acts."). Judicial immunity is intended to provide judges with the ability to act impartially and without fear of reproach in the form of a civil suit for money damages. *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S. Ct. 402, 408 (1979). This immunity is necessary to assure that judges can perform their judicial function "without harassment or intimidation." *Butz v. Economou*, 438 U.S. 478, 512, 98 S. Ct. 2894, 2913 (1978).

Malhan alleges that Judge Kessler's retaliation took the form of adverse rulings in his case. A judge, however, "will not be deprived of immunity because the action he [or she] took was in error, was done maliciously, or was in excess of his [or her] authority; rather, he [or she] will be subject to liability only when he [or she] has acted in the clear absence of all jurisdiction." *Azubuko*, 443 F.3d 302, 303 (quoting *Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct. 1099 (1978)). All of the allegations in the Complaint relate to actions taken by Judge Kessler in his capacity as a judge—specifically, those he took in his judicial capacity overseeing family court proceedings. Consequently, the plaintiffs have not set forth any facts that would show that Judge Kessler's actions were taken in the clear absence of jurisdiction, or were not adjudicatory in nature. *See Azubuko*, 443 F.3d 302, 303.

Count V is therefore dismissed as to Judge Kessler based on absolute judicial immunity. Because amendment would be futile, this dismissal is with prejudice.

### viii. Claims Against the DCPP

The New Jersey Division of Child Protection and Permanency ("DCPP") asserts that the claims against it ought to be dismissed because it has sovereign immunity from any claims of alleged wrongful conduct within the context of the plaintiffs' state court litigation. (DE 42-1 at 58). I agree.

DCPP is an arm of the state for Eleventh Amendment and sovereign immunity purposes. *Howard v. New Jersey Div. of Youth & Family Servs.*, 398 F. App'x 807, 811 (3d Cir. 2010) ("The damages and attorney fees claims against DYFS [the predecessor entity to DCPP] were properly dismissed instead

of stayed because DYFS is immune from suit under the Eleventh Amendment.") (citing *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess,* 297 F.3d 310, 323 (3d Cir. 2002)); *Sweet-Springs v. Dep't of Children & Families,* No. 12-706, 2013 WL 3043644, at *5 (D.N.J. June 17, 2013) ("Courts in this district have long held that [the predecessor entities to DCPP] are, beyond dispute, arms of the state for sovereign immunity purposes."); *see also Mammaro v. New Jersey Div. of Child Prot. & Permanency,* 814 F.3d 164, 166 (3d Cir. 2016), *as amended* (Mar. 21, 2016). The allegations in the Complaint relate only to DCPP's performance of its official functions at the behest of the state.

The claims against DCPP are therefore dismissed on Eleventh Amendment/sovereign immunity grounds. Because amendment would be futile, the dismissal is with prejudice.[17]

### ix.    Attorney General Grewal

The defendants assert that the Complaint contains no allegations of any conduct by New Jersey Attorney General Grewal with respect to the family court proceedings in question, and therefore does not set forth a claim against him. (DE 42-1). The plaintiffs do not explain what role, if any, Attorney General Grewal played in their alleged grievances or would play if they were granted the relief that they seek. The explanation in the plaintiffs' brief does nothing to clear it up: "Attorney General Grewal, in his official capacity as the official charged with defending State Policies and procedures, is properly named as a defendant, although he is largely the 'nominal' defendant." (DE 44 at 46).

---

[17]    To the extent the claim against DCPP involves the incident where it refused to allow Malhan to have an attorney present for a psychological evaluation, existing authority suggests that this is not a constitutional violation. *See State v. P.Z,* 152 N.J. 86, 111, 703 A.2d 901, 914 (1997) ("Defendant nonetheless suggests that his fundamental interest in the care and custody of his children either requires counsel to be present when defendant is questioned by DYFS [the predecessor to DCPP] or requires his comment about his lawyer's advice to be considered an invocation of the right to counsel. . . .[W]e decline to expand the rights of [parties being investigated by DCPP] to include protections accorded criminal defendants after they have been indicted or taken into custody [such as the Sixth Amendment right to counsel].").

In short, the Complaint fails to allege factually what AG Grewal supposedly did wrong, how he or his actions connect to any of the causes of action, or what effective relief could or should be ordered as against him. The Complaint thus fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). On this basis, the Complaint is dismissed as against Attorney General Grewal under Rule 12(b)(6) for failure to state a claim. This dismissal is without prejudice.

### b. Soaring Heights' Motion to Dismiss

Soaring Heights separately moves to dismiss Count VI, the only count in which it is named, for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and for improper joinder pursuant to Fed. R. Civ. P. 20. (DE 43). I agree that Malhan has failed to state a claim against Soaring Heights.

Malhan is the only plaintiff who asserts a claim against Soaring Heights. While not denominated as such, it appears to be a section 1983 *Monell* claim. (Comp. ¶¶ 580–86). This claim is based on the incident in which Soaring Heights, on advice of its counsel, refused to let Malhan pick up his children from the school because of the ambiguity it perceived in the family court's November 2017 Order. *See* Subsection I.b.i, *supra*. The relief sought is damages.

Preliminarily, and most directly, I rule that no constitutional claim has been stated. The family court's November 2017 Order had relaxed restrictions on Malhan's custody. After a transitional period, Malhan was to have "unsupervised parenting time with the children on Tuesdays after school until Friday mornings at school drop-off," and that "[t]he remaining days will be parenting time for [Myronova]." (Comp ¶¶ 157, 165). The same Order, however, provided that "[t]ransfers of the children between [Malhan] and [Myronova] will continue to take place at the Bayonne Police Station."

On December 12, 2017 (a Tuesday), Myronova brought the children to school in the morning. Malhan sought to pick them up in the afternoon, but

the school refused. The attorney for Soaring Heights explained that the November 2017 Order was ambiguous: Could the school release the children to Malhan, or were transfers required to take place at the Bayonne police station?

Myronova's dropping off the children at school, to be picked up in the afternoon by Malhan, could very plausibly be deemed a transfer of custody between the parents that did not take place at the Bayonne Police Station. It is possible that the family court intended Myronova to pick up the children from school and then transfer custody to Malhan at the police station. It was not unreasonable, and *a fortiori* did not violate any federal law, for the school to seek clarification from the family court. Nor was it unreasonable for the school, having learned that the court had required police involvement, to be apprehensive about potential safety issues.

I can find no substantive violation of constitutional rights here. The ambiguity in the order is genuine. No prudent school, particularly given the bitterly disputed issue of custody here, would transfer the child from one parent to the other without clarification.

Setting that aside, however, I find that the school would not properly be held liable under *Monell* standards. The actions here were actions of the school's (unidentified) attorney or possibly its employees. The entity sought to be held liable as a municipal entity is the school itself.[18]

---

[18]  Charter schools are treated a municipal entities which may in theory be liable under § 1983 for their employees' actions pursuant to *Monell*.

Moreover, based on Monell and its progeny, several district courts in the Third Circuit have held that charter schools are liable to suit under § 1983. *Schienblum v. Lehigh Valley Charter Sch. for the Arts*, No. 15-6433, 2016 WL 7429192, at * *4 (E.D. Pa. Dec. 20, 2016); *Dupell v. Franklin Towne Charter Sch.*, No. 16-278, 2016 WL 7042068, at *6 (D.N.J. Dec. 2, 2016); *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 908 F. Supp. 2d 597, 604-05 (M.D. Pa. 2012); *Irene B. v. Phila. Acad. Charter Sch.*, No.02-1716, 2003 WL 24052009, at *11 (E.D. Pa. Jan. 29, 2003); . . . .

*Afrika v. Khepera Charter Sch.*, No. 16-5298, 2017 WL 1042075, at *3 n.5 (E.D. Pa. Mar. 16, 2017). The parties, moreover, do not dispute that Soaring Heights is a

A municipality may be held liable under § 1983, however, only "if the plaintiff identifies a municipal 'policy' or 'custom' that was the 'moving force' behind the injury." *Jewell v. Ridley Twp.*, 497 F. App'x 182, 185 (3d Cir. 2012) (quoting *Monell*, 436 U.S. 658, 694); *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010) ("Under *Monell*, for municipal liability to attach, any injury must be inflicted by 'execution of a government's policy or custom.'" (quoting *Monell*, 436 U.S. 658, 694)). The plaintiff must identify with specificity the subject policy or custom and state how it caused the alleged constitutional violation. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003).

> A policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict. A custom is an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law.

*Natale,* 318 F.3d 575, 584 (internal quotations and citations omitted).

For purposes of a *Monell* claim, "to ascertain if an official has final policy-making authority, and can thus bind the municipality by his [or her] conduct, a court must determine (1) whether, as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question, and (2) whether the official's authority to make policy in that area is *final and unreviewable*." *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (internal citations omitted).

The "policy" alleged here is some school policy regarding the pickup of children, which is hypothesized but not described further. If the relevant policy is that "students shall not be released in violation of a court order," I decline to impose liability on that basis.

The state court had spoken; the school's policies regarding release of students at the end of the day, whatever they may be, had become irrelevant.

---

"person" acting under color of state law for purposes of this § 1983 claim. (*See* DE 43-1; DE 47; DE 48).

The school's employees did not have policymaking authority. Indeed, the school itself did not have that authority. It could only act in accordance with orders of the Court, and it was attempting to do so. Given the pendency of custody proceedings, unambiguous judicial authorization was required.

In short, no constitutional violation is alleged. Even assuming that one existed, the Complaint does not sufficiently allege a claim for the school's *Monell* liability. Soaring Heights' motion to dismiss is therefore granted.

The remaining question is whether this dismissal should be with or without prejudice. Plaintiffs have already amended their complaint three times. (DE 1; DE 7; DE 19; DE 45). Plaintiffs were alerted to these issues by Soaring Heights' motion to dismiss a prior iteration of the complaint. At one point, Plaintiffs wrote that they "ha[d] amended their Complaint to allege more explicitly that actions taken by Defendant Soaring Heights, were made pursuant to school policies as well as that the decisions were made or approved by individuals with final policy making authority." (DE 20 at 1). Because granting further leave to amend would be futile, this dismissal is with prejudice. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004).

## IV.    Conclusion

For the reasons set forth above, I will grant the State Defendants' motion to dismiss (DE 42) and grant Soaring Heights' motion to dismiss (DE 43) as described in this Opinion and the accompanying Order.

Dated: May 29, 2019

**Kevin McNulty**
**United States District Judge**